IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JEFF SHELAR,

        Plaintiff,

vs.                                   Case No. 03-4205-SAC

AMERIPRIDE SERVICES INC.,
d/b/a AMERIPRIDE LINEN AND
APPAREL SERVICES,

        Defendant.

MEMORANDUM AND ORDER

This case comes before the court on defendant's motion for summary judgment. Plaintiff contends he was sexually harassed based on a hostile work environment in his workplace and was constructively terminated from employment in retaliation for his complaint of sexual harassment.

**Summary judgment standard**

An important function of summary judgment is to eliminate factually unsupported claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.* at 323. The court considers the 'factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."' *Rohrbaugh v. Celotex*

*Corp.*, 53 F.3d 1181, 1182-83 (quoting *Blue Circle Cement, Inc. v. Bd. of County Comm'rs.*, 27 F.3d 1499, 1503 (10th Cir.1994)); *see also* Fed.R.Civ.P. 56(c). "Summary judgment is appropriate if the non-moving party cannot adduce probative evidence on an element of its claim upon which it bears the burden of proof." *Rohrbaugh*, 53 F.3d at 1183.

Once the movant demonstrates no genuine issue of material fact, the nonmovant is given "wide berth to prove a factual controversy exists." *Jeffries v. Kansas, Dep't of Soc. & Rehab. Servs.*, 147 F.3d 1220, 1228 (10th Cir.1998) (quotation omitted). Unsupported conclusory allegations, however, do not create an issue of fact. *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir.2004). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, at 251-52 (1986).

**Facts**

Plaintiff is a former employee of defendant who last worked for defendant as a salesman. He was employed by defendant from January 18, 1999 to May 12, 2001. In September of 1999, he accepted a sales position and thereafter became one of defendant's top salespersons and qualified for awards based upon

2

his success.  From December of 1999 to the date of his termination, plaintiff was allegedly subject to unwanted sexual advances by  Tonya Caraballo-McConnell.

During the relevant time,  Troy Harrison was plaintiff's supervisor as well as Caraballo-McConnell's supervisor.  Harrison's supervisor was Matt Wenzel, the General Manager in Topeka.  Over them was Darren Pearce, who had the highest management authority in Topeka.

On November 23, 1999, Troy Harrison signed and sent Caraballo-McConnell a written warning about sexual harassment based on claims made by Mr. Jon Leidel, also an employee of defendant, stating:

As you are aware, an employee has complained about inappropriate behavior of a nature which can be described as sexual harassment.

Tonya, the policy of Defendant in terms of sexual harassment is a "zero tolerance" policy.  Since this is a first offense, I am hereby warning you that any further inappropriate behavior, comments, etc. which violates the company's sexual harassment policy will be grounds for your termination.

Your work here has been excellent.  I am assuming that this is an isolated incident, and I look forward to working with you for many years to come.

3

Dk. 75, Exh. H.  Supervisor Harrison admits that when he delivered this written

warning to Caraballo-McConnell, he told her that he did not want to issue it and

may have told her that he had to issue the warning.  The complaining employee, Mr.

Jon Leidel, was terminated that same month.

Prior to Leidel's complaint, Supervisor Harrison had not received any

training in sexual harassment and was unaware of any policies related to it.  His first

training was his receipt of a policy in late 1999 or early 2000 which Mr. Pearce

distributed.  He consulted with Pearce and discussed how to create the warning

memo to Caraballo-McConnell.  Pearce had the authority and the duty to terminate

any sexually harassing behavior in the workplace.  Pearce personally believed that

Caraballo-McConnell's attire was unprofessional and provocative, but the

company had no dress code and he never confronted her about her attire.

Caraballo-McConnell subjected plaintiff to offensive sexual language

and asked him to sleep with her.  Caraballo-McConnell paged plaintiff four to five

times daily, and when he returned the page, she would greet him by saying, "How

ya doing, baby?"

On August 8, 2000, plaintiff prepared and submitted an anonymous

written complaint about Caraballo-McConnell's acts to Supervisor Harrison.  The

complaint did not mention sexual harassment but stated that she had been asking

4

people in the office to co-sign for a car loan, and that "something should be done" before she "does something to jeopardize the jobs of co-workers for not co-signing on her car loan." The complaint stated that it was sent by several employees and was sent anonymously "because of Tonya's well known vindictiveness." Dk. 75, Exh. A.

In November of 2000, when plaintiff was making calls from the upstairs sales room, Caraballo-McConnell approached him and said, "look at what you are missing," while lifting her skirt and exposing her naked body to plaintiff. She then straddled plaintiff's lap and attempted to kiss him repeatedly.[1] Plaintiff rejected Caraballo-McConnell.

That same month, (11/7/00) ex-employee Leidel, whose allegations of harassment by Caraballo-McConnell had given rise to her written warning, sued defendant for hostile work environment sexual harassment and retaliatory termination. Defendant was aware of this lawsuit.[2]

On December 5, 2000, plaintiff complained in writing to supervisor

_____

[1]For purposes of convenience, the court will refer to this as the "sales room incident."

[2]On January 28, 2003, the jury found in favor of defendant on Leidel's hostile work environment-sexual harassment claim and in favor of Leidel on his claim that he had been retaliatorily terminated in response to reporting McConnell's sexual harassment.

5

Harrison about Caraballo-McConnell's harassment, but did not specifically mention sexual harassment.  Dk. 75, Exh. B.  Plaintiff asserts and defendant denies that Supervisor Harrison received this letter, signed by plaintiff.  The record does not reflect that any personal discussion ensued or that any actions whatsoever were taken by defendant in response to this complaint.

In or about January, 2001, Caraballo-McConnell said to plaintiff, "Let's make a bet.  I'll bet you $300.00 I can take care of you better than any woman has done before," and, "I bet I can make you come in less than a minute." Plaintiff again rejected Caraballo- McConnell's advances.

In February 2001, General Manager Wenzel promoted Caraballo-McConnell to a management position.  At the time, General Manager Wenzel was aware of ex-employee Leidel's allegations of sexual harassment by Caraballo-McConnell, which were pending in the federal suit against defendant. (Wenzel depo. p. 34-36).

Defendant admits that in retaliation for plaintiff's rejections, Caraballo-McConnell withheld plaintiff's sales leads for the months of January and February 2001.  Defendant further admits that in March, 2001, Shelar complained to supervisor Harrison that Carballo- McConnell was withholding his leads in retaliation for his refusal to become sexually involved with her.  Soon thereafter,

Shelar received six pages of leads.

Plaintiff additionally alleges that in March of 2001, supervisor Harrison told plaintiff he was through with the company, that plaintiff had no future there and that Harrison no longer needed plaintiff's resume for consideration of a management position.  Plaintiff had never applied for any management positions, but had discussed the possibility of such a promotion with Supervisor Harrison, and believed he had previously been assured of a management position. Supervisor Harrison did not have the authority to promote anyone to management but was consulted in some such matters.

On April 6, 2001, defendant's general counsel received a letter from Plaintiff's attorney complaining about Caraballo- McConnell's sexual harassment of plaintiff.  Upon receipt of this letter, counsel for defendant immediately conducted an investigation.  On April 19, 2001, defendant terminated Caraballo-McConnell and on April 20, 2001, terminated supervisor Harrison. Plaintiff was not subjected to any further sexual harassment by Caraballo-McConnell or to any acts by Harrison on behalf of defendant.  Plaintiff was informed by management that he would not be subjected to any retaliatory activity for having made his complaint of sexual harassment, but plaintiff disbelieved that statement.  Plaintiff contends that defendant told him that the

terminations of Caraballo-McConnell and Harrison were unrelated to his complaint.

By letter dated April 20, 2001, plaintiff's attorney notified defendant's counsel that plaintiff's work environment was "utterly intolerable" and he would consider himself to be constructively discharged effective May 12, 2001.[3]  Upon receipt of this letter, management assured plaintiff he was welcome to remain employed at defendant.  Nonetheless, plaintiff considered the working conditions intolerable because he didn't feel like there was anybody he could believe or trust, he didn't receive any apology, he didn't feel a part of defendant, and he didn't feel he had a future with defendant.  By March of 2001, plaintiff and his wife had already found employment in Florida and were planning on quitting and moving to Florida.  Plaintiff considered the Florida position to be a contingency plan in the event of defendant's retaliation.  Plaintiff's last day of work for defendant was May 12, 2001.

**Sexual harassment claim**

The court first considers plaintiff's claim that he was subjected to a hostile work environment based on sexual harassment. To establish that a sexually hostile work environment existed, plaintiff must prove the following elements: (1) he

---

[3]Plaintiff selected the date of May 12, 2001 at least in part so that he could attend a  two-week trip which he had earned based on his previous sales results.

is a member of a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *Dick v. Phone Directories Co., Inc*., 397 F.3d 1256, 1263 (10th Cir. 2005), citing *Seymore v. Shawver & Sons, Inc*., 111 F.3d 794, 797, 798 (10th Cir.1997).

Additionally, to hold the employer liable when the perpetrator of the hostile work environment is a co-employee, rather than a supervisor, plaintiff must show that the employer knew or reasonably should have known about the harassment but failed to take appropriate remedial action. *Curran v. AMI Fireplace Co. Inc*., 163 Fed.Appx. 714, 719, 2006 WL 137405, *5 (10th Cir. 2006).

The parties do not dispute that plaintiff is a member of a protected group and was subject to unwelcome harassment.   Defendant contends only that plaintiff fails to raise a material question of fact that the harassment was sex-based, that the harassment was severe or pervasive, and that defendant's response to plaintiff's complaints of harassment was unreasonable.

**Sex-based**

It is true that workplace harassment is not "automatically

9

discrimination because of sex merely because the words used have sexual content

or connotations." *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80

(1998). Nonetheless, an inference of discrimination because of sex is easy to draw

where, as here, the harasser and the harassed are of opposite sexes and the

conduct involves explicit proposals of sexual activity. *Oncale,* 523 U.S. at 80;

*Dick*, 397 F.3d at 1263.

**Severe or pervasive**

For a hostile work environment claim to be actionable, the sexual

harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the

victim's] employment and create an abusive working environment.' " *Meritor Sav.*

*Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quotation omitted). A plaintiff need

not demonstrate psychological harm, nor is she required to show that his work

suffered as a result of the harassment. *See Davis v. U.S. Postal Service*, 142 F.3d

1334, 1341 (10th Cir.1998). In order to survive summary judgment, plaintiff must

produce sufficient evidence to allow a rational jury to find that (1) the harassing

conduct was "severe or pervasive enough to create an objectively hostile or abusive

work environment-an environment that a reasonable person would find hostile or

abusive"; and (2) that plaintiff "subjectively perceive[d] the environment to be

abusive." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993).

10

There is no dispute that plaintiff subjectively perceived his working environment to be abusive. Additionally, the court has little trouble finding that, viewed in the light most favorable to plaintiff and based upon the totality of the circumstances, a material question of fact exists as to the severity or pervasiveness of the conduct in this case. The incidents consist of express sexual propositions from Caraballo-McConnell who, although not plaintiff's supervisor, controlled his sales leads. The sales room incident, although a one-time event, is extreme and severe. This, coupled with the sexual propositions and the withholding of plaintiff's sales leads for the months of January and February 2001 in retaliation for plaintiff's rejections of her sexual advances, produces a firm conviction that there are genuine issues of material fact on this issue.

**Employer liability**

In contending that its response to its notice of sexual harassment was prompt and reasonably calculated to end the harassment, defendant focuses almost exclusively on its termination of Caraballo-McConnell and supervisor Harrison within approximately two weeks after having received the April 2001 letter from plaintiff's counsel. The court agrees that this action was prompt and reasonable and did end the harassment. Nonetheless, the weightier issue is whether defendant was put on earlier notice of Caraballo-McConnell's sexual harassment and

responded appropriately.

Plaintiff proceeds solely under a negligence theory, by which an employer may be directly liable if it fails to remedy or prevent a hostile work environment of which management-level employees knew or should have known. *See Adler v. Wal-Mart Stores, Inc*. 144 F.3d 664, 673 (10th Cir.1998), *Glover v. NMC Homecare, Inc.*, 13 Fed.Appx. 896, 902, 2001 WL 811786, *4 (10th Cir. 2001). To determine whether an employer is liable for negligence in allowing employees to engage in sexual harassment, this court makes two inquiries: "first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment." *Adler*, 144 F.3d at 673. Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees. *Adler*, 144 F.3d at 673.

### Complaints to management

Harrison was a management-level-employee for purposes of this analysis. *See Adler,* 144 F.3d at 674, citing 29 C.F.R. § 1604.11(d); Dk. 84, Exh. A (defendant's sexual harassment policy stating that "employees who feel they are being sexually harassed should be encouraged to bring the situation to the attention of their immediate supervisor..."). Thus, the incidents which plaintiff revealed to

supervisor Harrison provided actual notice to a management-level employee of those incidents.[4]

The court thus examines the content and context of complaints made to supervisor Harrison to determine whether they were sufficient to make a reasonable employer think there was some probability that Caraballo-McConnell was sexually harassing the plaintiff.  *See  Meritor*, 477 U.S. at 68-69; *McGuire v. State*, 2001 WL 969058, *5- *9 (D. Kan. 2001).

### 1999 Leidel complaint

The court first examines plaintiff's claim that defendant should have known that Caraballo-McConnell was sexually harassing him because defendant knew in 1999 that Caraballo-McConnell was sexually harassing Leidel.  Defendant contends it had no notice that Caraballo-McConnell had sexually harassed Leidel, despite the fact that defendant issued a written sexual harassment warning to Caraballo- McConnell based on Leidel's complaints.  Defendant reasons that because Leidel lost on his sexual harassment claim at trial in 2003, no sexually

---

[4]Plaintiff additionally contends that because Caraballo-McConnell was the harrasser and became a supervisor, the company is liable for all her acts, despite the fact that nearly all of the offensive acts occurred prior to the date that Caraballo-McConnell became a supervisor.  This claim "not only [does] not help to carry plaintiff's burden on summary judgment, but border[s] on the frivolous." *Adler*, 144 F.3d at 674.

harassing acts between Caraballo-McConnell and Leidel occurred or were known to defendant in 2000-2001.

The court finds this reasoning unpersuasive.  There are multiple reasons why Leidel could have lost on his sexual harassment claim - for example, because the jury believed that he welcomed Caraballo-McConnell's sexual acts. The mere fact that Leidel did not succeed at trial on this claim does not compel the conclusion that Caraballo-McConnell did not engage in acts which would be sexually harassing if unwelcomed, or that such acts were not known to defendant.

Instead, the court finds that plaintiff may properly rely on defendant's notice of Caraballo-McConnell's sexual harassment of Leidel if, during the course of his employment, Leidel complained to defendant's management of Caraballo-McConnell's acts similar in nature to those plaintiff complained of.  *See Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 784 (10th Cir.1995); *McGuire*, 2001 WL 969058, *9.  The court's review of the record reveals evidence that Leidel did complain to defendant's management of Caraballo-McConnell's acts similar in nature to those plaintiff complained of.  *See e.g.,* Pearce depo.p. 23-24, 35-36 (showing Pearce's admission that he knew from his interview with

Caraballo-McConnell while conducting his investigation,[5] that she wore to work low-cut tops that exposed part of her breasts and skirts that were too short, she wore clothing to work which could be construed as "provocative," she told salesmen employed by defendant that she didn't wear underwear, and she spoke to employees in the sales room at work about shaving her genitalia); Pearce depo., p. 54 (showing Pearce's belief after the interview process that Caraballo-McConnell was a "sexually aggressive woman"); Pearce depo. p. 52 (admitting that the complaints made by plaintiff in this case are "similar" to the type of sexually harassing behavior complained of by Leidel.); Pearce depo., p. 37-38 (showing Pearce's understanding that Caraballo-McConnell admitted to having engaged in most of the acts alleged by Leidel); Pearce depo., p. 36-37 (admitting that Caraballo-McConnell's dress and admitted behavior at work would violate a zero tolerance policy regarding sexual harassment); Pearce depo. p. 33, 6-  (creating an inference that defendant's approach may have been to wait until someone complained before taking any action).

The court further believes that Caraballo-McConnell's sexual harassment of Leidel is sufficiently near in time to her sexual harassment of the

---

[5]Although the record is incomplete, the court believes this investigation occurred during Leidel's employment and that the references are to the investigation of Leidel's internal complaint rather than of Leidel's federal complaint.

plaintiff.  In fact, plaintiff's theory is that when Leidel was retaliatorily terminated,

Caraballo-McConnell turned her attention to him.

## December 2000 signed complaint

The second notice to supervisor Harrison was on December 5, 2000,

when plaintiff complained to supervisor Harrison about Caraballo-McConnell's

"harassment" by stating:

> This letter is to confirm the multiple ways I have been harassed by
> Tonya since my acceptance of a sales position back in September of 1999.
> The latest harassment that was discussed in last weeks meeting happened
> about two weeks ago.  Tonya once again hit me up for money, and
> discussed paying me back in ways I would rather discuss with you
> personally.  You know she has also asked for money from Amber from last
> weeks meeting, which is unbelievable considering she just started working for
> AmeriPride.  I hope this letter is what you wanted in order to terminate
> Tonya, or help to push her towards moving to California. I really hope
> something is really being done this time Troy, for if  Tonya finds out I wrote
> this letter and is still working here, I'm sure their (sic) will be serious
> repercussions.

Dk. 75, Exh. B.

16

Although this complaint, signed by plaintiff, does not mention sexual harassment, certain statements made in the complaint support plaintiff's assertion that he had repeatedly complained verbally to supervisor Harrison about Caraballo-McConnell's conduct, without response, e.g., "*the latest harassment* that was discussed in last weeks meeting"; the "*multiple ways* I have been harassed by Tonya"; "I really hope something is really being done *this time* Troy"; and "I hope this letter is *what you wanted* in order to terminate Tonya, or help to push her towards moving to California."  If plaintiff had previously given verbal notice of sexual harassment to supervisor Harrison, a reasonable supervisor in his position upon receipt of this complaint would likely have known that at least some of the "harassment" alluded to in this complaint was sexual harassment.

Importantly, plaintiff asked supervisor Harrison to discuss the matter with him personally, in stating:

Tonya once again hit me up for money, and discussed paying me *back in ways I would rather discuss with you personally*...

*Id.*   This language, presented to the supervisor who was aware of Leidel's complaints about Caraballo-McConnell's conduct, is sufficient to trigger a duty to investigate further.  *See Robinson v. Jacksonville Shipyards, Inc*., 760 F.Supp. 1486, 1530 (M.D.Fla.1991); *Rauch v. Coyne*, 744 F.Supp. 1186, 1189

(D.D.C.1990); *Watts v. New York City Police Dep't*, 724 F.Supp. 99, 107-08 & n.

7 (S.D.N.Y.1989).  Instead, supervisor Harrison took no action in response to this

complaint.[6]

### March 2001 retaliation complaint

Caraballo-McConnell became a supervisor on some unstated date in

February.  Thereafter, she withheld plaintiff's sales leads in February in retaliation

for plaintiff's refusal to become sexually involved with her, as she had done in

January.[7]  Defendant admits that in March, 2001, supervisor Harrison received

notice from plaintiff that Carballo-McConnell was withholding plaintiff's sales leads

in retaliation for his refusal to become sexually involved with her.

The court rejects defendant's apparent contention that plaintiff's

receipt soon thereafter of six pages of leads from some unknown source suffices

as a prompt, effective response.  The record does not reveal where the leads came

_____

[6]Because the facts are read in the light most favorable to plaintiff, the court
assumes for purposes of this discussion that supervisor Harrison received this
complaint.

[7]Plaintiff makes no vicarious liability or quid pro quo claim, perhaps in
recognition that *Ellerth* "downplayed the distinctions between these two
court-created categories of harassment."  *See Coker v. Ball Janitor Service, Inc.*,
208 F.3d 225 (Table), 2000 WL 305487 (10th Cir.  Mar. 24, 2000) (indicating that "
these categories are helpful only for purposes of determining whether a plaintiff can
prove she was subjected to discrimination.")

from, whether they were the same ones withheld by Caraballo-McConnell, whether Harrison caused them to be given to plaintiff, or why or under what circumstances they were provided to plaintiff.

Even assuming that Harrison ordered Caraballo-McConnell to provide the leads to plaintiff in response to plaintiff's complaint, that response alone would be insufficient as a matter of law.  When supervisor Harrison learned that Caraballo-McConnell was withholding plaintiff's leads in retaliation for his refusal to become sexually involved with her, defendant was obligated to revisit its written sexual harassment warning to Caraballo-McConnell, reluctantly issued by supervisor Harrison on November 23, 1999, which stated:  " any further inappropriate behavior, comments, etc. which violates the company's sexual harassment policy will be grounds for your termination."  Harrison took no action whatsoever against Caraballo-McConnell, in non-compliance with defendant's prior warning to her.

But even had defendant never issued any previous sexual harassment warning to Caraballo-McConnell, Harrison's lack of response to plaintiff's complaint of  Caraballo-McConnell's sex-based retaliation would fly in the face of defendant's own "zero tolerance" sexual harassment policy, raising independent questions about the adequacy of defendant's response.

Based upon the totality of the circumstances, the court concludes that

the record presents a genuine issue of material fact as to whether defendant knew or should have known of the harasser's conduct toward the plaintiff and as to whether its remedial and preventative responses were adequate.  For all the reasons stated above, summary judgment is not warranted on plaintiff's sexual harassment claim.

**Retaliation claim**

Defendant additionally seeks summary judgment on plaintiff's claim that he was constructively terminated in retaliation for his reporting of sexual harassment.

To establish a prima facie case of retaliation under Title VII of the Civil Rights Act the employee must demonstrate: 1) she engaged in a protected employee action; 2) the employer took an adverse action either after or contemporaneous with the employee's protected action; and 3) a causal connection existed between the employee's action and the employer's adverse action.  *See Dick v. Phone Directories Co.*, 397 F.3d 1256, 1267 (10th Cir.2005) (considering retaliation claim based, in part, on hostile environment claim); *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1324 (10th Cir.1997) (considering retaliation claim based on disability claim).

*Burns v. Snow,* 130 Fed.Appx. 973, 986, 2005 WL 1140742, *12 (10th Cir.2005).[8]

The parties do not dispute that plaintiff engaged in protected conduct and do not address the element of causation. To meet the adverse effect element, plaintiff claims constructive discharge.  Defendant denies that plaintiff has demonstrated a viable constructive discharge claim, contending that plaintiff resigned of his own free will.

A constructive discharge occurs when a reasonable person in the employee's position would view her working conditions as intolerable and would feel that she had no other choice but to quit.  *See Heno [v. Sprint/United Management Co.*], 208 F.3d [847] at 858 [ (10th Cir.2000) ]; *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir.1992). In determining whether an employee's working conditions would cause such feelings in a reasonable person, we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant.  *See Jeffries v.*

---

[8]*See Burlington Northern & Santa Fe Ry.Co. v. White,* __ U.S. __,  2006 WL 1698953 (June 22, 2006) (holding that a plaintiff in Title VII retaliation case must show that the challenged action would have been materially adverse to a reasonable employee , *i.e.*, it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  This may include, for example, a schedule change, a lack of invitation to  training lunches, or reassignment to a less desired position within the same job description.)

*Kansas*, 147 F.3d 1220, 1233 (10th Cir.1998). The question is not whether

the employee's resignation resulted from the employer's actions, but whether

the employee had any other reasonable choice but to resign in light of those

actions. *See id.*

*Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1270 (10th

Cir.2004).

Plaintiff alleges he was constructively terminated on May 12, 2001.

Thus, the question is whether a reasonable person in plaintiff's position on May 12,

2001, would feel that working for defendant was so intolerable that the person had

no choice but to quit.

The court finds plaintiff has failed to demonstrate a dispute of material

fact on this issue.  Caraballo-McConnell's employment was terminated on April 19,

2001, and supervisor Harrison's employment was terminated on April 20, 2001.

Thus both the harasser and the non-responsive supervisor had been gone for

several weeks by the date plaintiff separated from employment.  Plaintiff has shown

no reason why a reasonable employee in plaintiff's situation would believe that he

would be subject to similar harassment or similarly non-responsive managers in the

future, or that his situation was unlikely to improve.

Plaintiff felt he could not be promoted to manager after his complaint,

but plaintiff has failed to show that any person who remained employed by defendant and who would be involved in the promotion process disfavored him in any way, let alone because of his complaint of sexual harassment.   Plaintiff's unfulfilled, subjective expectation of receiving a management position is no different than that of any employee who finds his hopes of being promoted dashed by a change of decision-makers, and falls far short of contributing to working conditions so intolerable that one would feel he had no other choice but to quit.

The fact that plaintiff had already found employment in Florida and was planning to move there also weighs against plaintiff in this analysis.  Although plaintiff testified that this was just a contingency plan in the event of retaliation, he points to no act allegedly taken by defendant which would have transformed this contingency into a reality for a reasonable person.   Plaintiff alleges that he felt demoralized when Wenzel told him that the terminations of Caraballo-McConnell and Harrison had nothing to do with him, but under the circumstances reflected in the record, it is reasonable to infer that Wenzel was merely attempting to preserve the confidentiality of a personnel matter, rather than  to imply that the sexual harassment complaint plaintiff made on April 6, 2001 was unfounded.

Even if the court were to consider plaintiff's date of constructive termination to be earlier, his claim fares no better. The court finds it significant that

23

by letter dated April 20, 2001, plaintiff gave three weeks notice of his intent to be considered constructively discharged, "effective May 12, 2001." The fact that plaintiff was willing to remain employed by defendant for an additional three weeks cuts against plaintiff's claim that his working conditions were intolerable on either April 20th or on May 12, 2001. Giving several weeks notice of the date on which one will be compelled to resign is unprecedented, in this court's experience, for a successful constructive discharge claim. Plaintiff's willingness to remain employed for purposes of attending the company trip he had earned cuts against his claim that a reasonable person in his position would have viewed his working conditions as intolerable and would have been compelled to quit.

IT IS THERERFORE ORDERED that defendant's motion for summary judgment (Dk. 74) is granted on plaintiff's retaliation claim and is denied on plaintiff's sexual harassment claim.

Dated this 6th day of July, 2006, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge